629 A.2d 1322

**James Edward CLARK**

v.

**STATE of Maryland.**

**No. 1762, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Sept. 2, 1993.

382

Arthur A. DeLano, Jr., Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore and Alexander Williams, Jr., State's Atty. for Prince George's County of Upper Marlboro, on the brief), for appellee.

Submitted Before MOYLAN, WENNER and CATHELL, JJ.

CATHELL, Judge.

James Edward Clark, appellant, was convicted by a jury in the Circuit Court for Prince George's County of assault with intent to murder and related offenses, and he was subsequently sentenced to ten years. Appellant presents three questions on appeal:

I. Did the trial judge err in denying Appellant's motion to dismiss for lack of a speedy trial?

II. Did the trial judge err in admitting evidence of other crimes?

III. Did the trial judge err in excluding relevant evidence?

As the factual determinations are not at issue in this appeal, we will only touch upon the background, and then supply facts as necessary to analyze the legal issues raised.

Appellant lived with Daryle Denice Willet, the victim, on and off for almost two years. Willet testified that on December 9, 1989, she called appellant and asked him to pick her up. She had moved out of his house several days earlier, but now had nowhere to go and wanted to return. Appellant picked Willet up and bought her some crack cocaine on the way home. Once they arrived at appellant's house, Willet changed her mind and refused to go inside. She walked towards a

nearby elementary school and approached the car of a man named Joe. According to Willet, when she tried to get into Joe's car, appellant grabbed her, dragged her to the school, beat her, stabbed her, and then fled.

Appellant was indicted on January 9, 1990, for stabbing Willet approximately nine times. On May 21, 1990, the State *nolle prossed*[1] the indictment because the State's main witness, Willet, refused to cooperate or testify against appellant. A second indictment was filed on March 17, 1992, after Willet agreed to cooperate with the prosecution. The trial began on September 14, 1992.

## I

"The Sixth Amendment [to the United States Constitution] guarantees that, '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial....'" *Doggett v. United States,* — U.S. —, —, 112 S.Ct. 2686, 2690, 120 L.Ed.2d 520 (1992). This right is "'fundamental' and is imposed by the Due Process Clause of the Fourteenth Amendment on the States." *Barker v. Wingo,* 407 U.S. 514, 515, 92 S.Ct. 2182, 2184, 33 L.Ed.2d 101 (1972) (footnote omitted). The Supreme Court has identified "some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right.... [They] identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530, 92 S.Ct. at 2192 (footnote omitted). Maryland has "applied these four factors in resolving speedy trial cases...." *State v. Bailey,* 319 Md. 392, 409, 572 A.2d 544 *cert. denied,* 498 U.S. 841, 111 S.Ct. 118, 112 L.Ed.2d 87 (1990) (and cases cited therein).

The Sixth Amendment right to a speedy trial is ... not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected pri-

---

1. *"Nol pros"* is the common term for *nolle prosequi,* or a formal declaration of the State not to prosecute the case.

marily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.

*United States v. MacDonald,* 456 U.S. 1, 8, 102 S.Ct. 1497, 1502, 71 L.Ed.2d 696 (1982).

In making its independent constitutional analysis, this Court must determine as a threshold issue whether the length of delay is presumptively prejudicial. To some extent, the length of the delay is a triggering mechanism. *Barker,* 407 U.S. at 530, 92 S.Ct. at 2192; *Bailey,* 319 Md. at 410, 572 A.2d 544.

A problem peculiar to the *Barker* test is its use of the terms *presumption of prejudice* and *actual prejudice.* When there has been a lengthy pretrial delay, one of constitutional dimension, then a presumption arises that the defendant has been deprived of his right to a speedy trial; a presumption of prejudice. Once this presumption asserts itself, a balancing test must be employed which involves a weighing of [the] four factors, one of which is actual prejudice. Actual prejudice involves a consideration of three interests the speedy trial right is meant to protect. Whatever importance it assumes in the final outcome is a function of the facts of the particular case.

*Howell v. State,* 87 Md.App. 57, 80, 589 A.2d 90 *cert. denied,* 324 Md. 324, 597 A.2d 421 (1991) (citing *Brady v. State,* 291 Md. 261, 266, 434 A.2d 574 (1981)).

To analyze the delay, we must first set out the sequence of events.

| | |
|---|---|
| December 9, 1989 | Attack occurs |
| December 19, 1989 | Appellant is arrested |
| January 9, 1990 | First indictment is filed |
| May 21, 1990 | State's Attorney *nolle prosses* charges |
| March 17, 1992 | Appellant is reindicted |
| April 2, 1992 | Appellant's counsel enters appearance and demands speedy trial |
| June 22, 1992 | Trial date is postponed at State's request, without objection |
| August 19, 1992 | Joint motion for continuance is granted |
| September 14, 1992 | Trial |

This sequence of events can be divided into three relevant periods; first, from December 19, 1989, the date appellant was arrested, to May 21, 1990, when the original charges were *nolle prossed.* This was a period of just over five months. The second time period, from May 22, 1990, to March 16, 1992, is a span of almost twenty-two months, during which appellant had no restrictions on his liberty and was, "at most, in the same position as any other subject of a criminal investigation." *MacDonald,* 456 U.S. at 8–9, 102 S.Ct. at 1502. The third period extends from March 17, 1992, the day appellant was reindicted, to September 14, 1992, the day of trial. This was a period of approximately six months.[2]

Of course, the length of the delay cannot be computed unless it is known when the period of delay starts. *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), provided this criterion. The speedy trial clock starts ticking when a person is arrested or when a formal charge is filed against him. *Id.* at 313, 92 S.Ct. at 459. *See State v. Gee,* 298 Md. [565], 568, 471 A.2d 712 [1984]. The Supreme Court has consistently adhered to this view.... So it is clear that "[u]pon the intervention of an arrest or a formal

---

**2.** Including March 17 and September 14, the period spanned 181 days. No *"Hicks"* (*State v. Hicks,* 285 Md. 310, 318, 403 A.2d 356 (1979)) problem was raised on appeal.

charge the Sixth Amendment speedy trial right is invoked." *Gee,* 298 Md. at 569, 471 A.2d 712.

*Bailey,* 319 Md. at 410, 572 A.2d 544.

The question we must first address is whether the clock started ticking on December 19, 1989, when appellant was first arrested, or on March 17, 1992, when he was reindicted. It will mean the difference between a delay of thirty-three months or a delay of six months.

In *United States v. MacDonald,* 456 U.S. 1, 7, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1982), the Supreme Court held that the time "after the Government, acting in good faith, formally drops charges" is not included in a speedy trial analysis. MacDonald, an Army captain, was charged with the murder of his wife and two children. The military charges were dropped after an extensive investigation, and MacDonald was honorably discharged. *Id.* at 4–5, 102 S.Ct. at 1499–1500. There was no allegation of bad faith in dismissing the charges; in fact the Army dismissed the charges after concluding that they were untrue. *Id.* at 10 n. 12, 102 S.Ct. at 1502 n. 12. The Justice Department continued the investigation with the Army's assistance. MacDonald was reindicted five years later and was ultimately convicted and sentenced to three consecutive life terms. *Id.* at 5–6, 102 S.Ct. at 1500–01.

While acknowledging that being subject to a criminal investigation is stressful, and may have adverse consequences, the Court opined that "once the charges instituted by the Army were dismissed, MacDonald was legally and constitutionally in the same posture as though no charges had been made. He was free to go about his affairs, to practice his profession, and to continue with his life." *MacDonald,* 456 U.S. at 10, 102 S.Ct. at 1502 (footnote omitted). The holding in *MacDonald* was expressly reaffirmed in *United States v. Loud Hawk,* 474 U.S. 302, 312, 106 S.Ct. 648, 654, 88 L.Ed.2d 640 (1986), where the Court found

that under the rule of *MacDonald,* when defendants are not incarcerated or subjected to other substantial restrictions on

their liberty, a court should not weigh that time towards a claim under the Speedy Trial Clause.

Maryland seems to have acknowledged the "rule of *Mac-Donald*." Judge Alpert, speaking for this Court, discussing "*MacDonald* and its progeny," stated that

> there the second indictment served to commence the critical time period because of the government's exercise involving good faith. In these cases the government did not deliberately attempt to circumvent the mandate of the Sixth Amendment by dismissing the charges. Instead, a sound prosecutorial decision was made.... "Good faith" in this context presupposes the diligence apparent in *MacDonald* in bringing a case to trial; there, after the dismissal of the military charges, the civilian ones were not brought until a much more extensive investigation was completed. *See also State Farm Ins. Co. v. White*, 248 Md. 324, 332–33, 236 A.2d 269 (1967) (good faith in the context of an insurance policy means "being faithful ... to the duty or obligation owed"; negligence is relevant in determining whether one acted in good faith).

*Lee v. State*, 61 Md.App. 169, 175–76, 485 A.2d 1014 *cert. denied*, 303 Md. 115, 492 A.2d 616 (1985) (footnote omitted). *Lee* involved an indictment that was dismissed by the trial judge because the State failed, through negligence, to comply with the Intrastate Detainer Act. The State reindicted two days later. *Id.* at 171, 485 A.2d 1014. Judge Alpert held that the dismissal because of the State's negligence, "although not amounting to bad faith, simply is not the same as a good faith dismissal sanctioned by the *MacDonald* Court.[3] Consequent-

---

3. As to prior use of the "good faith" standard in this context, Judge Alpert cites *Ward v. State*, 30 Md.App. 113, 130, 351 A.2d 452 *cert. denied*, 277 Md. 742 (1976), which held:

> In the absence of any evidence tending to show that the State released the appellant in order to further its own interests or to damage by delay the interests of the appellant, we hold that for the reasons hereafter stated, this time period does not constitute delay within the purview of a speedy trial analysis.

*See also Brady v. State*, 36 Md.App. 283, 290–91, 374 A.2d 613 (1977).

ly, we look to the period of the first indictment to determine when the speedy trial clock began to tick." *Id.* 61 Md.App. at 177, 485 A.2d 1014.

*State v. Bailey*, 319 Md. 392, 572 A.2d 544 (1990), presented the Court of Appeals with a similar situation. In February 1986, Bailey was arrested on several narcotics charges. He was later indicted on those charges, but in June 1986 the indictment was *nolle prossed.* *Id.* at 397, 572 A.2d 544. Bailey was then extradited to South Carolina for sentencing on a previous narcotics conviction. When he began serving that sentence he was reindicted on the charges previously dismissed in Maryland and brought back for trial. Trial commenced in February 1988, two years after his initial arrest in Maryland. *Id.* at 397–98, 572 A.2d 544.

The trial court denied Bailey's motion to dismiss on speedy trial grounds, but the Court of Special Appeals reversed in an unreported decision. *Bailey*, 319 Md. at 397, 572 A.2d 544. One of the questions presented to the Court of Appeals was whether the Court of Special Appeals erred in determining that the speedy trial clock should start ticking at the first, and subsequently dismissed, indictment instead of the second indictment. *Id.* at 408, 572 A.2d 544.

> The [Court of Special Appeals] observed that if the nolle prosequi were "a legitimate termination of the then pending prosecution, Bailey would lose.... If, however, the nolle prosequi were improper, so that the delay ran from the beginning of the first time period without interruption through the end of the third time period, the State would lose.

*Bailey*, 319 Md. at 405–06, 572 A.2d 544. The Court of Appeals noted our conclusion that the State's purpose in *nolle prossing* was tactical delay, and therefore they must pay the price of having that time included in the speedy trial analysis. *Id.* at 406, 572 A.2d 544. While not commenting further, the Court of Appeals accepted the period starting with the first indictment in considering whether the delay was of constitutional dimensions. *Id.* at 411, 572 A.2d 544.

In the case *sub judice*, the State maintains that it filed the *nolle pros* on the first trial date because Willet did not appear and the defendant produced notarized statements in which Willet stated that she did not want to pursue the charges. The question is whether this *nolle pros* was in "good faith." It seems apparent that the State acted in good faith when entering the *nolle pros*. Not only was the victim and only eyewitness refusing to testify, but the defense introduced the victim's notarized statements exonerating the defendant from any wrongdoing.[4]

There is even evidence in the transcript that the defendant was responsible for Willet's refusal to testify, and therefore for the *nolle pros*. Willet presented uncontradicted testimony that appellant threatened her life, and the life of her child and mother if she testified against him.

Q [by Mr. Wells, State's Attorney] At a time previous to this, Ms. Willet, you stated that you did not want to go forward with prosecuting Mr. Clark, is that correct?

A Yes, because I was afraid.

Q Could you ... tell the jury a little bit more about ... [w]hy you were afraid[?]

A Because he [appellant] had threatened to kill my son and my mother if I testified against him or did anything against him and I knew he would, because he's crazy.

. . . .

A ... [H]e would hurt my son and I knew that, I could feel that.

Q Did he make that known to you?

A Yes, he did. He told me several times if I testified against him or left him, he would kill my son and my mother if my mother tried to stop him....

. . . .

---

**4.** At the first trial date, Willet was again living with appellant and refused to cooperate in any way with the State. She later admitted to signing the exculpatory statements, but claimed they were signed under duress.

Q  Did you want to . . . go forward with that proceeding?

A  At that point, no, because I was afraid for my son's life.

In this instance the defendant used threats to coerce the State's witness into not testifying. The State's *nolle pros* of the original indictment was in good faith. It was not caused by the State but by the defendant's bad faith.

As is readily acknowledged by all connected with the resolution of these types of criminal charges, whether they be prosecutors, defense attorneys, assignment clerks or trial judges, it is not at all unusual for such charges to be *nolle prossed* or dismissed at, or shortly before, trial at the request of the complaining victim. There are, in some foreign jurisdictions, almost as many dismissals as prosecutions.[5]

Frequent dismissals at the request of the victim or caused by the victim's reluctance has been in the past a serious problem not only for the victims of domestic battery but for the administration of the courts.[6]  Much trial time is lost when

---

5.  In Los Angeles County, California, it is estimated that "[o]ut of 5,000 domestic-violence cases that cross our desk each year, half of the victims want to drop the charges." *Developments in the Law—Legal Responses to Domestic Violence*, 106 Harv.L.Rev. 1498, 1540 n. 86 (1993) (hereinafter Developments).

"But because domestic violence is a crime against society as well as against the victim, some prosecutor's offices have instituted 'no-drop' policies under which, absent danger to the abused woman, requests to drop charges are generally denied." *Developments, supra,* at 1540 (footnote omitted).

6.  While we above address the continuing problem of domestic abuse in the past tense, we do not mean to minimize the present problem. We use the past tense in order to acknowledge the significant improvements we feel have occurred in the Maryland courts as prosecutors, defense attorneys, judges, and their staffs have become more sensitized to the problems of the battered cohabitant. As we understand it, in some Maryland jurisdictions prosecutors have formed intra office victim assistance programs, provided special training for prosecution and staff on the subject, and have adopted more stringent and vigorous prosecution policies. Some prosecutors have early intervention policies where prompt interviews with victims are designed to produce statements that can later be utilized at trial. Some prosecutors attempt to prosecute without the victim's assistance by using 911 generated

cases are scheduled only to be dismissed at trial, or shortly prior thereto.

While a favorable resolution of the general problem of domestic violence has not yet been finally formulated, as we have noted, many suggestions are in the process of being reviewed by social scientists, members of the criminal justice system and others. What is readily apparent to us, as judicial participants in the process, is that "[w]hen criminal charges are justified ... declining to pursue [them is] contrary to the need for vigorous criminal justice responses to the problem of woman [spousal] battering." *Developments, supra,* at 1514 (footnote omitted).

In our role as members of the judicial branch, there are, in respect to domestic violence generally, normally few appropriate areas for us to address. One appropriate area, however, involves protecting our proceedings. To the extent that means are available to us, we cannot allow witnesses to be threatened or improperly coerced into dropping charges. At a minimum, we must protect those who appropriately seek the protection of the courts. We should not permit perversions of justice by those who would wrongfully create delay and then rely on that delay to seek dismissal on speedy trial grounds.

The instant case presents an appropriate situation in which to apply the *MacDonald* Rule. If the prior termination of charges is done in good faith,[7] we start the speedy trial

---

evidence, police reports, and other documentary matter, other witnesses testimony, etc. Efforts have and are being made to have the Legislature consider legislation that would create an exemption to the spousal privilege not to testify. Private victim assistance programs and facilities now address the problem. Additionally, Maryland continues to refine its domestic violence statutes in an effort to provide better remedies. See Family Law Article, Subtitle 5 "Domestic Violence" (Chapter 65 Acts of 1992 effective October 1, 1992).

7. If a defendant through the "good faith" use of persuasion, short of coercion, threats or intimidation, were to cause a witness/victim to decline to testify or otherwise create a situation where the prosecutor *nol prosses* the charges, that *nol pros* would still generally be a "good faith" action by the State.

clock at the second indictment.  We therefore hold in the case *sub judice* that the time preceding the second indictment will not be considered in our initial determination as to whether the delay is presumptively prejudicial.

The period from the reindictment was not more than six months, which in most cases would not be considered presumptively prejudicial.[8]  Under the circumstances of this case, six months delay is not of constitutional dimension.[9]

## II.

Appellant argues that it was error for the trial judge to allow a witness, James Austin, to testify over objection that Willet appeared bruised on several occasions, and that appellant was the one who caused the bruises.

Maryland Rule 4–323(a) requires an objection to "be made at the time the evidence is offered or as soon . . . as the grounds for objection become apparent.  Otherwise, the objection is waived." *See also Wilson v. State,* 87 Md.App. 659, 671, 591 A.2d 524 *cert. denied,* 324 Md. 325, 597 A.2d 422 (1991).

We agree with the State's argument that any objection appellant may have had to testimony that he beat Willet was waived for appeal purposes because of the numerous times defense counsel failed to object when the State elicited that testimony.  Willet testified prior to Austin, and she testified

---

8.  See *Howell v. State,* 87 Md.App. 57, 81, 589 A.2d 90 (1991), and cases cited therein for examples of delays considered presumptively prejudicial.

9.  Even if the period of delay was presumptively prejudicial, the State should not be penalized for any impairment of appellant's defense that flows from a defendant's bad faith actions.  While the constitutional right to a speedy trial belongs to the defendant in the *Barker* balancing analysis, the weighing of prejudice is a double-edged sword.  When the State *nol prosses* the charges, as they did in *Bailey,* 319 Md. 392, 572 A.2d 544, to gain a tactical advantage at trial any prejudice to the defendant's case will cut against the State.  Likewise, when a defendant's bad faith, such as that here, causes a delay, that delay should cut in his direction and negate any prejudicial effect.

repeatedly, without objection, about receiving beatings from appellant. Likewise, Austin testified, both before and after the defense objection in the record, that appellant beat Willet. During the questioning of witnesses, defense counsel failed to object on several occasions when the State elicited that testimony; thus, his objection is waived for this appeal. Rule 4–323. *See also Jones v. State,* 310 Md. 569, 588–89, 530 A.2d 743 (1987), *vacated and remanded on other grounds,* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988) (holding that no prejudice was sustained where certain evidence was admitted at one point without objection and admitted at another point over objection); *Kronovet v. Lipchin,* 288 Md. 30, 51–52, 415 A.2d 1096 (1980); *Tichnell v. State,* 287 Md. 695, 715–16, 415 A.2d 830 (1980), *aff'd on other grounds,* 297 Md. 432, 468 A.2d 1 (1983); *Robeson v. State,* 285 Md. 498, 504–07, 403 A.2d 1221 (1979), *cert. denied,* 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1981).

We perceive no error.

## III.

Appellant contends that it was error for the trial judge to refuse to allow testimony as to Willet's alleged avocation, and that, because of that avocation, she would be exposed to dangerous situations and therefore was likely beaten by someone other than appellant. Appellant's counsel attempted to elicit that testimony from a witness, Mr. Austin, but the judge refused to allow the line of questioning. The following ensued:

MS. SACCARELLI [defense counsel]: ... [K]eeping in mind that Mr. Wells [state's attorney] did say in his opening statement that she was ... I'd like to ask him about—

THE COURT: No way.... The fact that he brought it in doesn't make it admissible.

MR. WELLS: Right.

MS. SACCARELLI: I can't ask anything about ... whatsoever?

THE COURT: No. Because all you're doing is saying, this is a bad woman. So what? It doesn't affect anything.

MS. SACCARELLI: Well, just for the record, Your Honor, I'm not trying to say she's a bad woman. I'm trying to say she's—

THE COURT: That's exactly what you're doing.

MS. SACCARELLI: She's a woman who puts herself in situations where other people could attack her.

THE COURT: Forget it.... If you had ... proof that someone else did it, that's different but—

In order for evidence to be admissible, it must be material, that is the proposition for which it is offered must relate to the issue in the case. The evidence must also have probative value, which is the tendency of the evidence to establish the proposition for which it is offered to prove. *State v. Joynes,* 314 Md. 113, 119, 549 A.2d 380 (1988); *Worthington v. State,* 38 Md.App. 487, 497, 381 A.2d 712 (1978); *Blondes v. Hayes,* 29 Md.App. 663, 668, 350 A.2d 163 (1976).

The trial judge obviously disagreed as to the relevance of this line of questioning. "A trial court's determination on relevance will not be reversed by an appellate court absent a clear showing that it abused its discretion." *White v. State,* 324 Md. 626, 637, 598 A.2d 187 (1991); *State v. Allewalt,* 308 Md. 89, 101, 517 A.2d 741 (1986); *Worthington, supra,* 38 Md.App. at 498, 381 A.2d 712. No such showing was made.

We affirm.

JUDGMENTS AFFIRMED; APPELLANT TO PAY COSTS.